O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTOINE LAMONT JOHNSON,<br><br>               Petitioner,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>               Respondent. | CR-05-920-RSWL-1<br>CV-16-3419-RSWL<br><br>**ORDER re: Petitioner's AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255** [CV 11] [CR 2086] |

On August 13, 2010, Petitioner Antoine Lamont Johnson ("Petitioner") was sentenced to life in federal prison, consisting of 240 months on one count of conspiracy to commit Hobbs Act robbery; 240 months on one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951; and a life sentence for using, carrying, brandishing, and discharging a firearm during a crime of violence causing death under 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1). Pet'r's J & Commitment Order [CR 1657].

Currently before the Court is Petitioner's Amended Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 ("Motion") [CV 11] [CR 2086]. Petitioner asks the Court to strike the life sentence associated with his § 924(c) conviction, and vacate his underlying convictions due to ineffective representation provided by his trial counsel. See generally Pet'r's. Am. Mot. To Vacate, Set Aside, or Correct Sent. ("Mot."), ECF No. CR-2086, CV-11. Having reviewed all papers submitted pertaining to this Motion, the Court **NOW FINDS AND RULES AS FOLLOWS**: the Court **DENIES** Petitioner's § 2255 Motion. The Court also **DENIES** Petitioner's request for an evidentiary hearing, and **DENIES** Petitioner's request for a Certificate of Appealability.

## I. BACKGROUND

### A. Factual Background

#### 1. Underlying Offense Conduct

On or about February 27, 2004, Petitioner and co-Defendants Michael Williams, Patrick Holifield, and Larry Jordan ("co-Defendants"), all members of the Eight Trey Hoover Criminals street gang (the "Hoovers"), conspired to rob an Armored Transport Systems ("AT Systems") truck at the Bank of America, located at 8701 South Western Avenue in Los Angeles. Mot. Ex. A, First Superseding Indict. ("Indict.") 3:16-22, ECF No. CR-2086-1, CV-11-1.

On March 1, 2004, co-Defendant Jordan drove his van

to the parking lot of the Superior Market near the bank
while Petitioner and the others parked a stolen gray
sedan in the bank parking lot. Id. at 4:1-13.
Petitioner and co-Defendants Williams and Holifield
were each wearing latex gloves, and Petitioner wore a
Rastafarian wig with a Jamaican-colored cap and
shoulder-length dread locks ("the Rastafarian wig").
Johnson Revised Presentence Report ("PSR") ¶ 18, ECF
No. CR-1641.

Petitioner, armed with a 9mm "MAC"-style handgun
and wearing latex gloves and the Rastafarian wig; co-
Defendant Williams, armed with an AK47-type rifle and
also wearing latex gloves; and the other co-Defendants,
approached an AT Systems armored truck outside the
bank. Id. at ¶¶ 17-18; Indict. at 4:14-18. Together
they fired fifty-two rounds of ammunition at the guard,
the truck, and the exterior of the bank while stealing
multiple bags of money worth $436,000. Indict. at
4:19-5:2. Petitioner and co-Defendants shot and killed
guard Evelio Suarez, Jr. ("Suarez") as he was unloading
bags from the truck. Id. at 4:23-24, 7:19-22.

After shooting and killing Suarez, Petitioner and
co-Defendants fled on foot towards the getaway van.
PSR ¶ 20. The van stalled, so Petitioner and co-
Defendants jumped out and ran towards the Superior
Market parking lot to the second getaway van. Id.
While running, Petitioner dropped the Rastafarian Wig,
co-Defendant Williams dropped his latex gloves and an

empty AK47 ammunition magazine, and another co-Defendant dropped latex gloves. Id. ¶ 21. Petitioner did not make it to the second getaway van, which left with co-Defendant Williams and the others, but managed to escape by other means. Id. ¶ 22.

## 2. Burgess Testimony

After the robbery, law enforcement went public with a surveillance video of the getaway van used in the robbery and offered a $175,000 reward for apprehension of the robbers. Pl.'s Opp'n to Pet'r's Am. Mot. To Vacate, Set Aside, or Correct Sent. ("Opp'n") 46:17-23, ECF No. CR-2116, CV-38. Two weeks later, in May of 2004, Veronica Burgess ("Burgess") contacted law enforcement stating that she had information. Id. Burgess met with law enforcement several times and cooperated with them during a five-year period prior to the trial. Id. at 47:1-17; Opp'n, Ex. E Decl. of Joseph O'Donnell ("O'Donnell Decl.") ¶¶ 2-3, ECF No. CR-2116-5, CV-38-5. Burgess told police that during the week prior to the robbery, she overheard a discussion among a group of men, including Petitioner, planning the robbery while at a local restaurant, Fannie Mae's. Opp'n at 47:1-8; Opp'n, Ex. E Decl. of Daniel Jaramillo ("Jaramillo Decl.") ¶ 3.c, ECF No. CR 2116-5, CV-38-5. Burgess testified to the same before the grand jury. Opp'n at 47:4-8.

In August of 2007, the Court ordered that the identities of certain witnesses, including Burgess, be

4

disclosed to Petitioner and co-Defendant Williams forty-five days before trial.  See ECF No. CR-1711, 1712.  With a trial date of September 15, 2009, the date on which Burgess's identity would be disclosed was August 2, 2009.  On August 3, 2009, Burgess called law enforcement and informed them that "her name had been given to the 'Hoovers' and she had been receiving death threats."  O'Donnell Decl. ¶ 8.  The Government was subsequently unable to locate Burgess to have her testify at trial.  The Government amassed evidence that Petitioner caused the threats to be made against Burgess, and moved in limine to introduce her prior statements and identifications of Petitioner against Petitioner.  See ECF No. CR-1392.  The Court found that the Government met its burden to establish that Petitioner procured Burgess's unavailability, and therefore granted the Government's Motion to Admit the Burgess Evidence.  See ECF No. CR-1460.

At trial, the Government called four witnesses to testify about Burgess's prior identifications of Petitioner as being at the planning meeting at Fannie Mae's restaurant, including her testimony before the grand jury.  Opp'n at 57:17-20.  The Government elicited testimony that Burgess went to the restaurant to have breakfast with her friend, Reshanna Russell, between Wednesday and Friday during the week prior to the robbery and that while there, she overheard the conversation of a group of men, including Petitioner,

talking about an armed robbery.  Id. at 57:20-26.

While defense counsel vigorously cross-examined Burgess and called their own witnesses to impeach her testimony, the jury was not informed that after Burgess's identity was disclosed to Petitioner and she learned she would be expected to testify at trial, she recanted her statements.  Specifically, on August 4, 2009, Burgess was contacted by the defense attorney and investigator, and on August 5, 2004, Burgess told them that the initial statements she made to law enforcement and testimony to the grand jury about observing Petitioner at a planning meeting were false; that the police had employed suggestive interview techniques that induced her to make false pre-trial identifications; and that she was motivated by the substantial reward money she believed she could receive for providing information.  Mot. at 33:14-23; see generally Mot. Ex. E Decl. of Christian S. Filipiak ("Filipiak Decl."), ECF No. CR-2086-6, CV-11-6.

Petitioner contends that his trial counsel were ineffective in opposing the Government's Motion to Admit the Burgess Evidence, and that the hearsay statements made by Burgess implicating Petitioner should have never been presented to the jury in the first place.  Mot. at 34:34:17-44:21.  Petitioner further argues that since the Burgess evidence was admitted at trial, his trial counsel were ineffective for not introducing evidence that Burgess later

recanted her statements about witnessing a planning meeting involving Petitioner.  Id. at 44:22-46:5.

### 3.  Jamal Dunagan Testimony

At trial, the Government called Jamal Dunagan ("Dunagan"), a fellow Hoover gang member.  See Mot. at 55:7-9; Opp'n at 72:25-73:5.  Dunagan testified that he had been contacted by the suspected organizer of the armored truck robbery to reach out to Petitioner, who was refusing to return phone calls and meet with the other members of the robbery.  See Opp'n Ex. D Gov.'s Answering Br. on Appeal, 2013 WL 3790841 at *42-44 (citing GER 1217-1218, 1399-1400, 1414).[1]  According to Dunagan, he met with Petitioner in the Los Angeles area twice on March 2, 2004, the day after the armored truck robbery.  Opp'n Ex. D, at *44-46 (citing GER 1217, 1412-1414).  Dunagan testified that during the meetings, Petitioner confessed to his participation in the robbery.  Id.  Dunagan also testified that during the meetings, he saw that Petitioner had his foot wrapped, and that Petitioner told him he had discharged his "MAC" and shot himself while running away from the scene of the crime.  Id.

Petitioner claims that evidence available at trial, but uncovered during the habeas investigation, would

---

[1]  The Government attaches as Exhibit D to its Opposition, its Answering Brief on Appeal to the Ninth Circuit, which in turn cites to Government's Excerpts of the Record ("GER") PACER No. 10-50401, ECF No. 50.  The Court has reviewed each of the excerpts cited in connection with this Motion.

have shown that on March 2, 2004, Petitioner was not present in Los Angeles and therefore, could not have attended the meetings with Dunagan. Mot. at 56:22-25. Specifically, Petitioner alleges that the testimony of Petitioner's sister, Chetarah Sims, and phone records would have shown that on the evening of March 1, 2004, Petitioner left on a Greyhound bus in the direction of Memphis, Tennessee to visit his grandmother. Id. at 56:26-58:20; Pet'r's Reply ISO Pet'r's Am. Mot. To Vacate, Set Aside, or Correct Sent. ("Reply") 71:9-14, ECF No. CR-2121, CV-42, 45. Petitioner argues that his trial counsel were ineffective for failing to introduce this evidence, which would have impeached Dunagan's testimony. Reply at 70:13-76:19.

**B.** **Procedural Background**

In February 2007, a grand jury indicted Petitioner and co-Defendants on: (1) conspiracy to commit Hobbs Act robbery, (2) committing Hobbs Act robbery, and (3) using, brandishing, and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) which caused the murder of Suarez. The case proceeded to trial in early 2010. Petitioner and co-Defendant Williams were tried together. On March 11, 2010, a jury returned a verdict finding Petitioner and co-Defendant Williams guilty of all three counts charged in the indictment. Mot. at 5:15-19. Petitioner was sentenced to 240 months each for the first two counts and life for the third, all to be

served consecutively.  Id. at 5:20-22.

Petitioner appealed, and the Ninth Circuit affirmed his convictions on September 12, 2014.  See United States v. Johnson, 767 F.3d 815 (9th Cir. 2014). Petitioner's petition for a writ of certiorari to the United States Supreme Court was denied on December 14, 2015.

Petitioner filed a § 2255 Motion on May 18, 2016 [CV 1] [CR 2021].  On July 6, 2016, the Court set a briefing schedule for litigating the § 2255 Motion. [CV 7] [CR 2034].  On December 9, 2016, Petitioner filed his Amended § 2255 Motion [CV 11] [CR 2086].  The Court subsequently granted several stipulations by the parties to modify the briefing schedule, as well as three *ex parte* applications by the Government requesting an extension of time to file an Opposition, and one *ex parte* application by Petitioner requesting an extension of time to file his Reply.  The Government filed its Response to Petitioner's Motion ("Opposition") on September 11, 2018 [CV 38] [CR 2116]. Petitioner filed his Reply on January 11, 2019 [CV 42, 45] [CR 2121].

## II.  DISCUSSION

### A.  Legal Standard

1.  § 2255 Motion

28 U.S.C. § 2255 provides that a federal prisoner may make a motion to vacate, set aside or correct his sentence on the ground that the sentence was imposed in

violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. § 2255(a).

The remedy under § 2255 does not encompass all claimed errors in conviction and sentencing. United States v. Addonizio, 442 U.S. 178, 185 (1979); United States v. Wilcox, 640 F.2d 970, 973 (9th Cir. 1981) ("Errors of law which might require reversal of a conviction or sentence on appeal do not necessarily provide a basis for relief under § 2255.") A mere error of law does not provide a basis for collateral relief under § 2255 unless the claimed error constituted "a fundamental defect which inherently results in a complete miscarriage of justice" and renders the entire proceeding "irregular and invalid." Addonizio, 442 U.S. at 185-86; Hill v. United States, 368 U.S. 424, 428 (1962).

Further, "the Court has cautioned that § 2255 may not be used as a chance at a second appeal." United States v. Berry, 624 F.3d 1031, 1038 (9th Cir. 2010); United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993) ("Section 2255 . . . is not designed to provide criminal defendants multiple opportunities to challenge their sentence."). A matter that has been decided adversely on appeal from a conviction cannot be

relitigated on a § 2255 motion absent changed circumstances of law or fact.  Odom v. United States, 455 F.2d 159, 160 (9th Cir. 1972).  Similarly, "[h]abeas relief is an extraordinary remedy and will not be allowed to do service for an appeal."  Bousley v. United States, 523 U.S. 614, 621 (1998) (quoting Reed v. Farley, 512 U.S. 339, 354 (1994)) (internal quotation marks omitted).

    2.    Ineffective Assistance of Counsel

    To prevail on a claim for ineffective assistance of counsel, a defendant must satisfy the two prong test set forth in Strickland v. Washington, 466 U.S. 668, 687-90, 694 (1984).  A defendant must establish (1) that his trial counsel's performance was constitutionally deficient, and (2) that the deficient performance prejudiced the defense.  Id.  To meet the deficient performance prong, defendant must show that counsel's performance fell below an objective standard of reasonableness.  Id.  In evaluating trial counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689 (quotations omitted).  To establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  Ultimately, "[s]urmounting [Strickland's] high bar is never an easy task."  Runningeagle v. Ryan, 686 F.3d 758, 775 (9th Cir. 2012) (internal quotations omitted).

**B.   Validity of § 18 U.S.C. 924(c) Conviction**

18 U.S.C. § 924(c) penalizes use of a deadly or dangerous weapon during a "crime of violence."  In turn, §§ 924(c)(3)(A)-(B) define "crime of violence." Section 924(c)(3)(A) contains the "Force Clause": "[a crime of violence is an offense that is a felony and that] has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  Section 924(c)(3)(B), the "Residual Clause," defines a crime of violence as: "[an offense that is a felony and] that by its nature, involves a substantial risk that physical force against the person or property of another may be used in committing the offense."

Petitioner seeks to vacate his § 924(c) conviction on the grounds that: (1) it may have been based on the conspiracy charge, which is not a "crime of violence;" and (2) Hobbs Act robbery fails to qualify as a "crime of violence" under the Force Clause.  Mot. at 7:1-7. The Court addresses each argument in turn.

///

///

1    1.  § 924(c) Conviction Was Based on the
2        Substantive Hobbs Act Robbery

3        "A conviction based on a general verdict is subject
4    to challenge if the jury was instructed on alternative
5    theories of guilt and may have relied on an invalid
6    one." Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008).  In
7    such instances, harmless-error analysis applies and a
8    reviewing court "should ask whether the flaw in the
9    instructions 'had a substantial and injurious effect or
10   influence in determining the jury's verdict.'"  Id.
11   (quoting Brecht v. Abrahamson, 507 U.S. 619, 623
12   (1993)).  This question requires courts to consider
13   "the record as a whole" and "'take account of what the
14   error meant to [the jury], not singled out and standing
15   alone, but in relation to all else that happened.'"
16   Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010)
17   (quoting Kotteakos v. United States, 328 U.S. 750, 765
18   (1946)).  Ultimately, "[t]here must be more than a
19   reasonable possibility that the error was harmful . . .
20   . [b]ut where a judge in a habeas proceeding is in
21   grave doubt as to the harmlessness of the error, the
22   habeas petitioner must win." Rogers v. McDaniel, 793
23   F.3d 1036, 1042 (9th Cir. 2015) (internal quotations
24   and citations omitted).

25       Here, the jury instructions indicated that the
26   Government could prove the § 924(c) charge by showing
27   Petitioner (1) committed the crime [Hobbs Act robbery];
28   or (2) was part of the Hobbs Act conspiracy.  Mot. Ex.

D-1, Jury Instrs. Nos. 18, 19, ECF No. CR-2086-4, CV-11-4. Petitioner takes issue with these instructions, insisting that Hobbs Act conspiracy is not a crime of violence under § 924(c) and is thus an invalid predicate upon which a § 924(c) conviction can be based. It is undisputed that Hobbs Act conspiracy is only a crime of violence if it satisfies the Residual Clause. However, after the Supreme Court's recent decisions in <u>Johnson v. Untied States</u>, 135 S. Ct. 2551 (2015), and <u>Sessions v. Dimaya</u>, 138 S. Ct. 1204 (2018), circuit courts are split on the issue of whether the Residual Clause is unconstitutionally vague. The issue is currently pending before the Ninth Circuit and the Supreme Court.[2] However, the Court need not await the decisions of the Supreme Court or Ninth Circuit to address Petitioner's claims because the record reveals that the jury based its conviction on the substantive Hobbs Act robbery, and not the conspiracy. Accordingly, even assuming that Hobbs Act conspiracy is an invalid predicate, any error in the jury instructions was harmless since it did not have a

---

[2] The Supreme Court granted certiorari in <u>United States v. Davis</u>, 903 F.3d 483 (5th Cir. 2018) (per curiam) *cert. granted,* 2019 WL 98544 (Jan. 4, 2019), to decide "whether the subsection-specific definition of 'crime of violence' in 18 U.S.C. § 924(c)(3)(B) . . . is unconstitutionally vague." While the Ninth Circuit has yet to weigh in, it recently requested supplemental briefing on the issue in <u>United States v. Begay</u>, No. 14-10080, Docket No. 107, and stayed proceedings pending the disposition of <u>Davis</u>.

substantial and injurious effect in determining the jury's verdict.

Petitioner was convicted of all three counts charged: (1) conspiracy to commit Hobbs Act robbery, (2) Hobbs Act robbery, and (3) the § 924(c) count. Mot. Ex. B, ECF No. CR-2086-2, CV-11-2. The conspiracy was inextricably intertwined with, and in furtherance of, the substantive Hobbs Act robbery. As this Court previously determined with respect to co-Defendant Williams, since the jury convicted Petitioner of the Hobbs Act robbery, "it makes little sense that Petitioner could have only discharged a firearm in the conspiracy but not the substantive Hobbs Act robbery." Order re Williams' Am. Mot. To Vacate, Set Aside, or Correct Sent. ("Williams' Order") 15:24-16:2, No. 16-2569-RSWL, ECF No. 22. This is especially so in light of the fact that no evidence was produced at trial suggesting that firearms were used in the conspiracy, but not in the substantive offense.

Nonetheless, Petitioner argues that based on the jury instructions, it is possible that the jury's finding of Petitioner's guilt on the conspiracy count could have led to his convictions on the robbery and gun counts.[3] Mot. at 12. Petitioner contends that the

---

[3] The jury instructions for the substantive Hobbs Act robbery allowed the jury to convict Petitioner based on him "being part of a conspiracy as charged in Count One, during or in furtherance on which the reasonably-foreseeable crime of robbery affecting interstate commerce was committed." Mot. Ex. D-1, Jury

15

primary evidence at trial of his involvement in the conspiracy was the testimony of Burgess, in which she stated that she saw and overheard Petitioner at a local restaurant planning the robbery with some of his co-conspirators. Mot. at 12:15-22. Petitioner contends that the jury could have accepted this evidence as proof of Petitioner's involvement in the Hobbs Act conspiracy, and on that basis, convicted Petitioner of the conspiracy, robbery, and gun charges. Id.

However, Petitioner overestimates the import of the Burgess testimony to the case. The planning meeting discussed by Burgess provided evidence of only one of the fourteen overt acts identified by the Government, in support of the conspiracy. See Mot. Ex. A, Indict. at 3:9-5:23. While the Burgess testimony spanned in excess of 150 pages of transcript, Petitioner's cross-examinations took up approximately 90 of the pages, and in total, witness testimony at trial covered approximately 2,380 transcript pages. Opp'n at 16:10-14; Decl. of Elizabeth R. Yang ("Yang Decl.") ¶ 5, ECF No. CR-2086, CV-11. Moreover, in its closing argument, the Government's summary of the Burgess evidence comprised less than 1½ pages of an approximately 16-page argument, and followed a recitation of the evidence of the substantive crime itself, which

Instr. No. 13. The jury instructions for the § 924(c) count similarly allowed the jury to convict Petitioner if the Government proved that he committed the substantive robbery, or was part of the conspiracy. Id. Jury Instrs. Nos. 18, 19.

provided circumstantial evidence of advanced planning consistent with a conspiracy. Opp'n at 16:21-17:3; 3/5/10 RT 4-20, ECF No. CR-1718. For example, such evidence included wearing disguises, using multiple semi-automatic weapons, setting up two getaway vans, and lying in wait (appearing to know the armored truck's route and schedule) to commit the robbery. Opp'n at 17 n. 11; 3/5/10 RT 7.

Moreover, an examination of the record as a whole reveals that the jury rested its conviction on the Hobbs Act robbery. See Pulido, 629 F.3d at 1019 ("[W]e consider whether the evidence in the trial record made it likely that the instructional errors had a substantial and injurious effect on the verdict."). At trial, the Government put forth substantial evidence of Petitioner's involvement in the Hobbs Act robbery. As stated by the Ninth Circuit:

> The evidence at trial incriminating both Johnson and Williams was strong. Jamal Dunagan, former Hoover gang member [of which Petitioner was affiliated], testified that both Johnson and Williams had confessed to having participated in the robbery-murder. He also testified that Derrick Maddox, an uncharged co-conspirator, had given him a detailed account of the robbery and subsequent shootout, including the extent of Johnson and Williams' involvement. In addition, the Government introduced evidence that DNA recovered from a wig and latex gloves that were found on the scene matched the DNA profiles of Johnson and Williams respectively.

Johnson, 767 F.3d at 820.[4]  That the § 924(c) conviction
was predicated on the substantive robbery is further
illustrated by the Court's instructions to the jury, in
which the Court identified the substantive robbery as
the predicate crime of violence for the § 924(c) count.
Opp'n at 15:7-15 (citing 3/5/10 RT 175-77) ("a crime of
violence, robbery") ("the crime of robbery . . . which
I instruct you is a crime of violence").).  This
instruction mirrored the language of the indictment,
which identified the predicate crime of violence for
the § 924(c) count as "the March 1, 2004, robbery of an
Armored Transport Systems armored truck."  Mot. Ex. A,
Indict. at 7.  See Ortega v. United States, No. 16-cv-
1622-GPC, 2017 WL 6371739, at *4 (S.D. Cal. Dec. 13,
2017) (looking to the "plain language of the
superseding indictment" to find that the § 924(c)
conviction rested on a valid predicate).  The
Government also identified the predicate crime of
violence for the § 924(c) count as "the armored truck
robbery" and not the conspiracy in its closing argument
to the jury.  Opp'n at 14:21-29 (citing 3/5/10 RT 10).

Petitioner contends that the Government
mischaracterizes the Court's instructions to the jury
and the Government's closing argument, because in both

---

[4] This list only illuminates some of the evidence from which
the jury may have based its decision.  The Court notes that trial
in this case lasted approximately four weeks and involved over 60
witnesses and 250 exhibits.

situations, the jury was repeatedly told that they
could find Petitioner guilty of the robbery and gun
charges if they found Petitioner guilty of the
conspiracy charge. Reply at 15:1-19. The Court does
not dispute that the jury was so informed. However, as
discussed above, the only evidence of Petitioner's
involvement in the conspiracy—apart from the
circumstantial evidence of advanced planning evident
from the substantive robbery itself—was the Burgess
testimony. Yet at trial, Petitioner elicited
substantial evidence impeaching Burgess as a witness.[5]
To assume that the jury adopted the shaky Burgess
testimony as the basis for its convictions, and ignored
the "strong" evidence incriminating Petitioner in the
underlying robbery, would be a stretch beyond the
bounds of rationality.

In sum, the Court finds that to the extent that
Hobbs Act conspiracy is an invalid predicate for a §
924(c) conviction, the jury instruction allowing the
jury to convict Petitioner of his § 924(c) count by a
finding of guilt as to his conspiracy or robbery counts
was harmless error.

2. Hobbs Act Robbery is a Crime of Violence

Petitioner contends that even if his § 924(c)
conviction was predicated on substantive Hobbs Act

---

[5] A full discussion of the evidence impeaching Burgess
appears in the Court's discussion of Petitioner's claim of
ineffective assistance of counsel.

robbery, substantive Hobbs Act robbery is not a crime of violence under the Force Clause of § 924(c).[6] Petitioner supports his position with two primary arguments: (1) the Force Clause of § 924(c) is only satisfied by proof of intentional violent physical force but Hobbs Act robbery can be violated without proof of such force; and (2) the Hobbs Act definition of fear of injury does not always constitute an active threatened use of force on the person as required by the Force Clause. Mot. at 13:9-22:9. Similar arguments were previously raised by co-Defendant Williams in his § 2255 motion, and this Court provided detailed reasoning as to why they lack merit. See Williams' Order at 17:14-22:14. Nonetheless, Petitioner asserts that this Court relied on flawed analysis in its Williams Order, and argues that the cases cited by this Court are insufficient to support the conclusion that Hobbs Act robbery is a crime of violence. Mot. at 17:23-22:3. However, both prior to and after this Court's Williams' Order, the Ninth Circuit (albeit in an unpublished decision), sister

---

[6] This issue is also the subject of co-Defendant Williams' appeal to the Ninth Circuit. See United States v. Williams, No. 05-cr-00920, ECF No. 2091. The Ninth Circuit granted Williams' request for a certificate of appealability on the following issues: (1) whether Williams' conviction under § 924(c) must be vacated in light of Johnson v. United States; and (2) whether the Hobbs Act robbery is a "crime of violence" under the Force Clause (§ 924(c)(3)(A)). Id. The Ninth Circuit held the case in abeyance pending its decision in United States v. Begay, No. 14010080, which was continued pending the Supreme Court's final resolution in United States v. Davis, 2019 WL 98544.

circuits, and district courts have uniformly held that Hobbs Act robbery constitutes a crime of violence under the Force Clause.  See e.g. U.S.A. v. Dorsey, No.14-cr-00328(B)-CAS, 2017 WL 3159981, at *12 (C.D. Cal. July 24, 2017) (citing cases from the Ninth, Seventh, Second, Eleventh, and Fifth Circuits to support its finding that "there is an 'unbroken consensus' among the courts across the country that a Hobbs Act robbery constitutes a crime of violence"); United States v. Figueroa, No. 12cr236-GPC, 2017 WL 3412526, at *8 (S.D. Cal. Aug. 9, 2017) ("[T]he Second, Third, Fifth, Eighth, and Eleventh Circuits agree that Hobbs Act robbery is categorically a crime of violence under the physical force clause."); United States v. Hall, No. 12-cr-00132-JAD-CWH-3, 2017 WL 2174951, at *2 (D. Nev. May 17, 2017) ("District courts and other circuit courts . . . overwhelmingly agree that Hobbs Act robbery qualifies as a crime of violence under § 924(c)'s force clause."); United States v. Elima, SACR 16-00037-CJC, 2016 WL 3556603, at *1 (C.D. Cal. June 6, 2016) (citations omitted) (stating that the argument that Hobbs Act robbery is not a crime of violence "has been 'squarely rejected by district courts nationwide'").

     The Force Clause defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A).  To

determine whether Hobbs Act robbery satisfies this definition, the Court applies the categorical approach announced by the Supreme Court in Taylor v. United States, 495 U.S. 575, 600 (1990). "Under this approach, we do not look to the particular facts underlying the conviction, but 'compare the elements of the statute forming the basis of the defendant's conviction with the elements of' a 'crime of violence.'" United States v. Benally, 843 F.3d 350, 352 (9th Cir. 2016) (quoting Descamps v. United States, 133 S. Ct. 2276, 2281 (2013)). As set forth in the jury instructions, the elements for Hobbs Act robbery, 18 U.S.C. § 1951, are: "(1) defendant unlawfully took or obtained property . . . against his will; (2) defendant used actual or threatened *force*, or violence, or fear of injury, immediate or future, to the person; (3) defendant intended to permanently deprive the person of the property; (4) as a result, interstate commerce was obstructed, delayed, or affected." Mot. Ex. D-1, Jury Instr. No. 13.

Petitioner first argues that Hobbs Act robbery can be violated without proof of intentional violent force; that is through negligent or reckless conduct—as opposed to intentional conduct—and through the use of minimal—as opposed to violent—force. In support of his argument, Petitioner analogizes Hobbs Act robbery to common law robbery and draws on judicial interpretations of similar statutes. Notably, however,

Petitioner fails to cite any case where a court has found Hobbs Act robbery can be committed without intent or with only minimal force.[7] Yet, in order to prevail under a categorical approach, Petitioner must at least show a "realistic probably" that the Hobbs Act statute could apply to non-violent, unintentional conduct. See Moncrieffe v. Holder, 559 U.S. 184, 191 (2013) ("[T]here must be a 'realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime.'"). Because Petitioner has failed to satisfy this burden, the Court maintains its position as set forth in William's Order, and agrees with the long list of courts who have rejected the argument that Hobbs Act robbery can be committed through reckless or negligent conduct, or with only minimal force.[8]

---

[7] Of course, Petitioner cannot support his assertion with his own case, since 52 rounds of ammunition were discharged from multiple firearms during the underlying robbery.

[8] See e.g. United States v. Goldsby, 2018 WL 1146401, at *2 (D. Nev. Feb. 22, 2018) (emphasis added) ("Every case cited by the Government and independently researched by the Court has found that a Hobbs act robbery requires the *intentional* use, attempted use, or threatened use of *violent* force."); United States v. Mendoza, 2:16-cr-00324-LRH-GWF, 2017 WL 2200912, at *9 (D. Nev. May 19, 2017) ("Hobbs Act robbery requires a defendant to intentionally use, attempt to use, or threaten to use [violent] force."); Hall, 2017 WL 2174951, at *3 ("As to whether one can commit Hobbs Act robbery with too little force to qualify as the sort of violent force contemplated by § 924(c), I agree with the weight of authority that finds this argument 'wholly unavailing.'").

Petitioner next argues that Hobbs Act robbery is not a crime of violence because it can be violated by non-violent fear of injury to property. This precise argument was discussed and rejected by the Ninth Circuit in United States v. Howard, 650 Fed. Appx. 466, 468 (9th Cir. May 23, 2016), which concluded that Hobbs Act robbery is a crime of violence.[9] Undeterred, Petitioner highlights three scenarios which he claims are possible from the language of the Hobbs Act: (1) injury to property may be accomplished without threat of violent force; (2) fear of future injury is contrary to the required need for an active violent crime; and (3) threatened force includes implied threats of force that is contrary to a present willingness to use force. Reply at 34:15-23.

In support of the first scenario, Petitioner cites jury instructions from two district of Nevada cases and one district of Texas case. See United States v. Brown, No. 11-CR-334-APG, Dkt. 197 (D. Nev. July 28, 2015); United States v. Nguyen, No. 03-cr 158-KJD-PAL,

---

[9] Petitioner takes issue with the Ninth Circuit's decision in Howard arguing that it relied on "an outdated decision," United States v. Selfa, 918 F.2d 749 (9th Cir. 1990). Mot. at 19:20-23. However, the cases which Petitioner claims render Selfa outdated were decided well before the Ninth Circuit's decision in Howard. Without a showing that Howard has been effectively overruled, it remains good law and the Court finds its reasoning persuasive. See e.g. United States v. Esteban, Cr. No. 02-00540 SOM, 2017 WL 49693239, at *7 (D. Haw. Oct. 31, 2017) (citing Howard for the proposition that Hobbs Act robbery is a crime of violence, and recognizing that "[t]he Ninth Circuit has broadly reaffirmed [Selfa] as recently as this year.").

Dkt. 157 (D. Nev. Feb. 10, 2005); and <u>United States v.</u> <u>Hayes</u>, No. 95-141-D (N.D. Tex. 1995). The court in each case provided an instruction effectively indicating that the "fear of injury" requirement of the Hobbs Act can be shown through fear that another will cause economic harm. Petitioner then cites <u>United</u> <u>States v. Camp</u>, 903 F.3d 594, 602 (6th Cir. 2018) for the proposition that "threats to property alone — whether immediate or future — do not necessarily create a danger to the person." However, the Sixth Circuit in <u>Camp</u> made this statement in the context of evaluating whether Hobbs Act robbery qualifies as a crime of violence under the career offender Sentencing Guidelines, and specifically held that Hobbs Act robbery constitutes a crime of violence under the Force Clause of § 924(c). <u>Id.</u> Further, more recent cases than those cited by Petitioner have consistently concluded that "Hobbs Act robbery cannot be accomplished without at least the threat of physical force." <u>McGriggs v. Shinn</u>, No. EDCV 16-1757-SVW (JEM), 2017 WL 9477013, at *8 (C.D. Cal. Sept. 27, 2017) ("A taking by 'actual or threatened force' or 'violence' or 'fear of injury' necessarily involves at least the threat to use physical force. Other courts that have considered this question . . . have also reached the conclusion that 'fear of injury' is 'limited to fear of injury from the use of violence . . . .'"). Finally, in each case cited by Petitioner, the defendant was

convicted for participating in a robbery which did involve a threat or the use of violent force.  See Brown at Dkt 1 (defendant indicted for involvement in an armed robbery during which she brandished a firearm); Nguyen at Dkt. 232 (defendant indicted for involvement in an armed robbery/homicide); Hayes at Dkt. 353 (defendant convicted for violating the Hobbs Act and using and carrying a firearm in furtherance thereof).  Consequently, Petitioner has still failed to cite a case in which the statute was actually *applied* in the manner identified.

Petitioner also fails to cite any case in which Hobbs Act robbery has been applied in a manner consistent with the second two scenarios.[10]  To the contrary, the only cases addressing these arguments

---

[10]  Petitioner cites a Second Circuit case, United States v. Santos, 449 F.3d 93 (2d Cir. 2006), to support his claim that the "threat of force" requirement of the Hobbs Act can be satisfied by implied threats (for example, alluding to a person's reputation).  The court in Santos indicated that the reasoning of another Second Circuit case, which held that one's reputation could be sufficient to instill fear as required by Hobbs Act extortion, "can be applied to the Hobbs Act robbery context *as long as the reputation is knowingly used to instill a 'fear of injury.'"* Id. (emphasis added).  Petitioner conveniently leaves out the requirement that the reputation must be used "knowingly to instill a fear of injury" and the court's subsequent discussion that in such situations, it must consider "(1) how a reasonable person in the victim's position would perceive an action . . .; (2) the perpetrators' knowledge that a victim would perceive such action to be part of a pattern of violence, intimidation, or threats; and (3) the perpetrators' intention to 'exploit their victim's fears.'" Id.  Thus, even if a person's reputation were used as a means to instill fear, the context in which the reputation would have to be used still requires proof of a communicated willingness to use force.  In other words, an implied threat is insufficient to satisfy the Hobbs Act.

have found them unpersuasive.  See e.g. United States v. Buck, 847 F.3d 267, 274-75 (5th Cir. 2017) (rejecting the argument "that because an individual could be convicted under the Hobbs Act for nothing more than threatening some future injury to the property of a person who is not present, this cannot be a crime of violence").  Thus, Petitioner fails to establish a "realistic probability" that the Hobbs Act could apply to such conduct.

Petitioner responds that the "realistic probability" standard plays no role in the analysis where the language of the statute indicates that it will be applied in a certain manner.  Reply at 37:2-15. However, the statute itself, belies Petitioner's contention.  Specifically, when read in context, "[t]he requirement that the taking [of property] be from the person or in his presence . . . supports the conclusion that a fear of injury means a fear of physical injury, which requires the threatened use of physical force." United States v. Mendoza, 2:16-cr-00324-LRH-GWF, 2017 WL 2200912, at *8 (D. Nev. May 19, 2017); United States v. Goldsby, No. 2:16-cr-00294-JCM-VCF, 2018 WL 1146401, at *2 (D. Nev. Feb. 22, 2018) (citing United States v. Pena, 161 F. Supp. 3d 268, 279 (S.D.N.Y. Feb. 11, 2016)) ("'The text, history, and context of the Hobbs Act compel a reading of the phrase 'fear of injury' that is limited to fear of injury from the use of

force.'"); [11] <u>McGriggs</u>, 2017 WL 9477013, at *8 ("Hobbs
Act robbery by definition requires non-consensual
taking. <u>See</u> 18 U.S.C. § 1951. A taking by 'actual or
threatened force' or 'violence' or 'fear of injury'
necessarily involves at least the threat to use
physical force."). Indeed, the fact that Petitioner is
unable to cite to any case in which the Hobbs Act was
applied in the way he indicates, is further proof that
the language of the statute does not lend itself to
Petitioner's proffered interpretation. <u>Cf.</u> <u>Mendoza</u>,
2017 WL 2200912, at *7 ("It is therefore telling in
this case that Mendoza is unable to cite a single
instance from the over 70 years since the Hobbs Act's
enactment in which a defendant was convicted under the
statute after having used or threatened to use nominal
force.").

This Court declines to part from the consensus
among the courts that Hobbs Act robbery constitutes a
crime of violence under the Force Clause of § 924(c).
Thus, the Court holds that Hobbs Act robbery, a crime

---

[11] Petitioner disputes the applicability of <u>Pena</u> for several
reasons, each of which the Court finds unpersuasive. Notably,
<u>Pena</u> is still relied on by many Courts for its statutory
construction of the Hobbs Act. <u>See</u> <u>e.g.</u> <u>United States v. Casas</u>,
No. 10cr3045-1, 2017 WL 1008109, at *4 (S.D. Cal. Mar. 14, 2017)
("This Court is also persuaded by the reasoning of the district
court in <u>Pena</u>, and finds that the 'fear of injury' prong of §
1951(b)(1) does not render Hobbs Act robbery overly broad in
comparison with the definition of 'crime of violence' in §
924(c)(3)(A)"); <u>United States v. Huff</u>, No. 1:07-CR-00156-LJO,
2017 WL 3593373, at *6 (E.D. Cal. Aug. 21, 2017) (same); <u>United
States v. Johnson</u>, No. SACR 16-00029-CJC-5, 2016 WL 7223264, at
*4 (C.D. Cal. Dec. 12, 2016) (same).

28

of violence, is a sufficient predicate for the § 924(c) charge.  As such, Petitioner's conviction on this basis is valid, and the Court **DENIES** Petitioner's request to strike his § 924(c) sentence.[12]

## C. <u>Ineffective Assistance of Counsel Claims</u>

Petitioner was represented by attorneys Amy E. Jacks and Richard P. Lasting (collectively, "Trial Counsel") in his underlying criminal case.  Petitioner claims that Trial Counsel provided ineffective assistance in (1) opposing the Government's Motion to Admit the Burgess Testimony and countering that testimony at trial, and (2) failing to present the testimony of Petitioner's sister and phone records that would have purportedly impeached the testimony of Dunagan.

### 1. <u>Burgess Evidence</u>

Petitioner alleges ineffective representation in that: (1) Trial Counsel erred in opposing the Government's Motion to Admit Burgess's Testimony; and (2) Trial Counsel erred in failing to introduce evidence at trial that Burgess recanted her testimony implicating Petitioner.  Reply at 44:1-6.

---

[12] Petitioner argues that if the Court chooses to reverse the life sentence on the gun count, then it should also re-evaluate the consecutive sentences imposed for the conspiracy and robbery counts because the two offenses are part of one continuous act and the multiple punishments imposed violate Double Jeopardy.  <u>See</u> Reply at 39:12-43-16.  Because the Court declines to reverse the life sentence, it need not address this argument.

a.  *Opposing Government's Motion to Admit*
    *Burgess Testimony*

Petitioner asserts that Trial Counsel made several
prejudicial errors in opposing the Government's Motion
to Admit the Burgess Testimony: Trial Counsel revealed
an attorney-client confidential communication that the
Government used without objection to support its
Motion; Trial Counsel failed to argue that the
Government had not shown a "good-faith" effort to
produce Burgess at trial; and Trial Counsel failed to
investigate or produce evidence regarding the actual
source of the threat made against Burgess.  Petitioner
contends that but for these errors, the Court would
have denied the Government's Motion to Admit the
Burgess testimony and her out-of-court statements would
not have been produced at trial.

Ultimately, Trial Counsel's handling of the Burgess
testimony is only relevant under <u>Strickland</u> insofar as
it prejudiced the defense.  <u>See</u> <u>United States v.</u>
<u>Sanchez-Cervantes</u>, 282 F.3d 664, 672 (9th Cir. 2002)
("If either prong [of the <u>Strickland</u> test] is not met,
we must dismiss the claim.").  In other words, unless
Petitioner establishes "a reasonable probability that,
absent the errors, the factfinder would have had a
reasonable doubt respecting guilt," then Trial
Counsel's alleged errors are inconsequential in this
context.  <u>Strickland</u>, 466 U.S. at 2068-69.

As discussed in section II(B)(1) of this Order, the

Burgess evidence, while important, was not necessary to this case. Although Burgess placed Petitioner at the planning meeting at Fannie Mae's, the other evidence of Petitioner's involvement in the actual Hobbs Act robbery provided circumstantial evidence of Petitioner's participation in the conspiracy sufficient to support his conspiracy conviction. Indeed, the planning meeting was merely one of fourteen overt acts identified by the Government in support of the conspiracy. See Mot. Ex. A, Indict. at 3:9-5:23.

Moreover, even as presented, the Burgess evidence was shaky. Trial Counsel spent considerable time impeaching Burgess's statements, and her credibility as a witness. Petitioner's efforts to impeach Burgess included extensively cross-examining the Government's witnesses who testified about Burgess's out-of-court statements, through which Petitioner adduced evidence of law enforcement's incomplete note-taking and report-writing, as well as inconsistencies in Burgess's prior statements. Such inconsistencies included: what day she witnessed the planning meeting, what time she was at Fannie Mae's, what exactly she overheard, how many individuals participated in the planning meeting, and the identities of the participants. See Opp'n at 58:6-14 (citing GER 2011-31, 2039-52, 2054-69, 2073-75, 2088-99). Moreover, Trial Counsel called three of their own witnesses to impeach Burgess. First, Trial Counsel introduced into evidence a testimonial

stipulation from a detective who arrested Burgess in December of 1994 for counterfeit credit card fraud. Id. at 58:18-21 (citing GER 2640-41). The testimonial stipulation identified Burgess's statements and admissions in connection with the fraud. Id. Second, Trial Counsel called Reshanna Russell, the friend identified by Burgess as being with her at Fannie Mae's restaurant. Id. at 58:21-26 (citing GER 2673-97). Russell denied having ever been to Fannie Mae's with Burgess, denied witnessing any planning meeting, and denied previously telling law enforcement that she had been to Fannie Mae's in late February 2004 and that she had eaten at Fannie Mae's with Burgess before. Id. Trial Counsel then called a LAUSD custodian of records who confirmed Russell's testimony that she worked every day during the week of February 23, 2004, except for Wednesday (February 25). Id. at 58:27-59:2 (GER 2698-2702). In light of the substantial evidence impeaching Burgess, it is highly unlikely that her out-of-court testimony played a significant role in the jury's decision.

That Petitioner would have been convicted even without the introduction of the Burgess testimony is further illustrated by the Ninth Circuit's Opinion. See Johnson, 767 F.3d at 820. Specifically, in laying out the relevant facts of the case, the Ninth Circuit explained that the Court instructed the jury to not consider the Burgess testimony when assessing co-

Defendant Williams' guilt.  Id.  Immediately after
making this statement, the Ninth Circuit recognized
that "[t]he evidence at trial incriminating *both*
Johnson and Williams was strong."  Id. (emphasis
added).  The Ninth Circuit supported this assertion by
pointing to the following evidence: testimony from
Dunagan who indicated that both Petitioner and Williams
had confessed to having participated in the robbery-
murder; testimony from Dunagan that an uncharged co-
conspirator, Derrick Maddox, gave him a detailed
account of the robbery and shootout, including the
extent of Petitioner and Williams' involvement; and
evidence that DNA recovered from a wig and latex gloves
that were found on the scene matched the DNA profiles
of Petitioner and Williams respectively.  Id.  Notably,
the Ninth Circuit did not include the Burgess testimony
in the paragraph identifying the "strong" incriminating
evidence.  Nor did it need to, as the fact that
Williams was convicted of all three counts charged even
without the Burgess evidence shows that the Burgess
evidence was not vital to the jury's ultimate decision.

    While it is possible that the Burgess evidence may
have had "some conceivable" effect on the verdict,
Strickland requires more.  466 U.S. at 693.  Petitioner
must establish "a reasonable probability," that is, "a
probability sufficient to undermine confidence in the
outcome."  Id. at 694.  Here, Petitioner has failed to
establish that absent the Burgess evidence, there is a

reasonable probability that the jury would have had a reasonable doubt regarding Petitioner's guilt on any of the counts charged.[13]  See Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1994) (denying a claim for ineffective assistance of counsel because "the errors, if any, occurred, were harmless in light of the overwhelming evidence of guilt").[14]

### b. *Burgess's Recantation Evidence*

Given that the Burgess evidence was produced at trial, the next issue raised by Petitioner is whether Trial Counsel was deficient in failing to introduce evidence that Burgess recanted her statements

---

[13] Petitioner repeatedly asserts that this was a "close case" and supports this assertion with the fact that the jury deliberations lasted for three and a half days.  However, the length of their deliberations were not unreasonable considering trial in this case lasted approximately four weeks and involved over 60 witnesses and 250 exhibits.  Moreover, during their deliberations, the jury only sent out one note and the note did not concern Petitioner.  See ECF No. CR-1495, 1719.

[14] Petitioner moves under Rule 7(a) of the Rules Governing Section 2255 Proceedings for The United States District Courts, to expand the record to include the Declarations of Kathy Smith, Veronica Williams, Amy E. Jacks, and Petitioner.  These declarations would support Petitioner's claim that Trial Counsel was deficient in opposing the Government's Motion to Admit the Burgess Evidence, see Section II(C)(1)(a), because Petitioner contends that they establish (1) that Petitioner was not responsible for threatening Burgess to procure her unavailability to testify at trial, and (2) that Trial Counsel had no authority to disclose a confidential client communication.  Reply at 76:25-78:10.  However, the Court concluded that it need not address the first prong of the Strickland test because even if Trial Counsel were deficient, there was no prejudice since the Burgess evidence did not have a significant impact on the jury's verdict.  In other words, even if the declarations were permitted in the record, the analysis would not change.  As such, the Court **DENIES as MOOT** Petitioner's request to expand the record.

incriminating Petitioner.  Specifically, Petitioner

contends that Trial Counsel could have presented

evidence which would have informed the jury of the

following: that statements Burgess made to law

enforcement and the grand jury that Petitioner was

present at a planning meeting were false; that the

police had employed suggestive interview techniques

that induced Burgess to make false statements; and that

Burgess was motivated by reward money offered by

police.[15]  Mot. at 25-33, 44-54; Reply at 61:11-20.

Trial Counsel debated the issue of presenting

evidence of Burgess's recantation at trial.  <u>See</u> Opp'n

Ex. B, Responses of Amy E. Jacks to Gov.

Interrogatories ("Jacks Interrog. Resp.") No. 7, ECF

No. CV 38-2 ; Opp'n Ex. C, Resp. of Richard P. Lasting

to Gov. Interrog. ("Lasting Interrog. Resp.") No. 9,

ECF No. CR-2116-3, CV-38-3.  Strategically, however,

Trial Counsel chose not to introduce this evidence for

fear that it would end up hurting Petitioner's case.

Jacks Interrog Resp. Nos. 8-9; Lasting Interrog. Resp.

No. 9.  Specifically, Burgess went missing and was

unavailable to testify at trial because she had been

threatened by the "Hoovers" after her identity had been

exposed to the defense.  O'Donnell Decl. ¶ 8.  The

_____

[15] Petitioner then argues in depth why the recantation
evidence would have been admissible at trial.  <u>See</u> Mot. at 46:9-
53:18.  For purposes of analyzing Petitioner's Motion, the Court
assumes, but does not hold, that the evidence would have been
admissible.

Government moved in limine to introduce Burgess's out-of-court statements on the basis that Petitioner caused these threats to be issued against Burgess, thereby procuring her unavailability. <u>See</u> ECF No. CR-1392. Based on the evidence presented to the Court, the Court agreed with the Government and permitted the Burgess evidence to be introduced against Petitioner. <u>See</u> ECF No. CR-1460. The Ninth Circuit affirmed. <u>See</u> <u>Johnson</u>, 767 F.3d at 823 ("[T]he evidence tended to show that Johnson alone had the means, motive, and opportunity to threaten Burgess . . . ."). Trial Counsel expressed concern that if they introduced evidence that Burgess recanted her statements implicating Petitioner, that would open the door for the Government to put on evidence that Burgess only recanted her statements in response to being threatened by Petitioner. As stated by Ms. Jacks:





Jacks Interrog. Resp. No. 8.

In evaluating whether Trial Counsel's performance was deficient, the question is whether the assistance was "reasonable considering all of the circumstances." Strickland, 466 U.S. at 688, 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"). Here, it is apparent that Trial Counsel thoughtfully weighed the competing considerations in determining whether to introduce the recantation evidence. Irrespective of whether their ultimate decision was more right than wrong or more wrong than right, it was reasonable for Trial Counsel to believe that under the circumstances, Petitioner's case would benefit most by not introducing the recantation evidence. See Strickland, 466 U.S. at 689 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are

37

virtually unchallengeable."); <u>Santos</u>, 741 F.2d at 1169

("A tactical decision by counsel with which the

defendant disagrees cannot form the basis of a claim of

ineffective assistance of counsel.").

Moreover, Trial Counsel was correct in recognizing

that had it been permitted to introduce the recantation

evidence, the Court would have allowed the Government

to respond by introducing the threat evidence. The

threat evidence would likely include the statements

made by Burgess to law enforcement a mere twenty-four

hours after her identity was disclosed to the defense,

specifically that her name had been given to the

"Hoovers" and she had been receiving death threats.

Opp'n at 51:6-9; O'Donnell Decl. ¶ 8. Depending on the

grounds under which the recantation evidence was

introduced, a number of evidence rules would have

rendered the threat evidence admissible. These

statements could have been admitted under Federal Rule

of Evidence ("FRE") 804(b)(6), the forfeiture by

wrongdoing exception to the rule against hearsay, for

the same reasons why Burgess's out-of-court statements

were permitted to be introduced at trial in the first

place. The threat evidence could also be admitted in

order to repair Burgess's credibility under FRE 806

which provides that "[w]hen a hearsay statement . . .

has been admitted in evidence, the declarant's

credibility may be attacked, *and then supported*, by an

evidence that would be admissible for those purposes if

38

the declarant had testified as a witness." Fed. R.
Evid. 806 (emphasis added). Further, the threat
evidence could be admitted to impeach the recantation
testimony. See Fed. R. Evid. 607. Petitioner contests
the applicability of the impeachment by arguing that
"the [G]overnment would be improperly attempting to
impeach its own witnesses" and "the hearsay statements
would not serve to directly impeach the content of the
recantation evidence." Reply at 66:17-26. However,
FRE 607 specifically states that even "the party that
called the witness" may impeach her. Fed. R. Evid.
607. Moreover, the threat evidence would be used to
impeach the recantation evidence because it would show
that Burgess changed her story for the defense as a
result of the threat made against her for initially
speaking out against Petitioner.

Petitioner contends that even if Trial Counsel were
concerned that the threat evidence would be admitted,
they could have moved in limine to exclude it before
determining whether to present the recantation
evidence. While it is true that Trial Could have taken
extra measures to make certain that the threat evidence
would be admissible, "effective assistance need not be
'infallible' assistance." United States v. McAdams,
759 F.2d 1407, 1409 (9th Cir. 1985) (citations
omitted). Moreover, Trial Counsel were both highly
experienced criminal defense litigators. See Jacks
Interrog. Resp. Nos. 1-2 (███████████████████

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ███████; Lasting Interrog. Resp. Nos. 1-3 ███████████

4 ███████████████████████████████████████

5 ███████████████████████████████████████████

6 ███████████████████████████████████████████

7 ████████████.  It goes without saying that Trial

8 Counsels' decisions were largely based on their

9 experience and legal knowledge.  Thus, Trial Counsel's

10 assumption that the threat evidence would be admissible

11 was reasonable under the circumstances.

12     Lastly, Petitioner asserts that even if the threat

13 evidence was admitted, the defense could have shown

14 either that someone other than Petitioner caused the

15 threat, or that the hearsay claims of threats were

16 false and developed to explain Burgess's absence.

17 Reply at 61:28-62:2.  However, this alternative ignores

18 Ms. Jacks' explanation ███████████████████

19 █████████████████████████████████████████████

20 ████████████████████████████████

21 █████████████████████████████████████████

22 ██████████████████████████████ and also ignores

23 Trial Counsel's fear ███████████████████████

24 █████████████████████████████████████████

25 ██████████████████████████████████████

26 ███████████████████ ██ ██████████████████████ Jacks

27 Interrog Resp. Nos. 8.  Without this individual's

28 testimony, it is not clear that Trial Counsel would

40

have been able to pin the threat on anyone else. Additionally, ████████████████████████████

██████████, it seems that Trial Counsel considered Petitioner's suggestion that Trial Counsel could have explained to the jury that the threat allegations were false, but ultimately decided that the risk of the jury siding with the Government was too great. <u>Id.</u> ████

████████████████████████████████████████████████

████████████████████ ████████████ ████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████ As stated, this kind of strategic decision is not enough to establish that Trial Counsel's performance was deficient.

In sum, Petitioner has failed to establish that Trial Counsels' performance was deficient, as required to state an ineffective assistance of counsel claim.[16] Even the culmination of the alleged errors do not rise to the level of "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687. Moreover, as discussed, Petitioner has failed to

---

[16] Petitioner contends that assuming the truth of the recantation evidence, then the Government presented false evidence (in the form of Burgess's prior statements to the police and grand jury testimony) to the jury in violation of Petitioner's due process rights. Mot. at 53:21-54:25. However, this claim is procedurally defaulted because Petitioner failed to raise it both before the district court and on direct appeal. <u>See</u> <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998).

establish that even without the Burgess evidence, there is a reasonable probability that the jury would have a reasonable doubt about Petitioner's guilt.  Thus, the Court **DENIES** Petitioner's claim for ineffective assistance of counsel with respect to Trial Counsel's handling of the Burgess evidence.

    2.  <u>Dunagan Evidence</u>

Petitioner contends that Trial Counsel was ineffective for failing to introduce the "alibi-type" evidence that Petitioner was on a bus heading toward Memphis on March 2, 2004, the date when Dunagan claimed that he met with Petitioner in Los Angeles.[17]  Prior to trial, Dunagan was ██████████████████████████ ████████████ between Trial Counsel and Petitioner.  Jacks Interrog. Resp. No. 11.  Trial Counsel expressed to Petitioner that they were concerned about introducing this "alibi-type" evidence because:



_____

[17] Petitioner analogizes the evidence that he was out of the Los Angeles area on March 2, 2004, to "alibi evidence" and cites cases finding ineffective assistance of counsel where the counsel failed to present actual alibi evidence.  However, at most, the evidence that Petitioner was out of the Los Angeles area on March 2, 2004 is evidence that would impeach Dunagan and his testimony.  Contrary to the cases cited by Petitioner, this evidence does not provide Petitioner with an alibi to the underlying robbery.

_Id._ at No. 12.  Nevertheless, Trial Counsel agreed to ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████  _Id._ at No. 12.  Trial Counsel's investigation consisted of: ██████████████████████████████

████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████.[18]  _Id._ at Nos. 12, 15; Lasting Interrog. Resp. Nos. 12-14.  As stated by Ms. Jacks, ██████████████████████████████

██████████████████████████████████

█████████████████████████████████████████

████████████████████  Despite their own beliefs, however, Trial Counsel were unable to corroborate

---

[18] Ms. Jacks also stated that ████████████████████████

████████████████████████████████ Jacks Interrog. Resp. No. 15.a.

that Petitioner left Los Angeles on a Greyhound bus on the evening of March 1, 2004 headed for Memphis, as he and Sims alleged.

Petitioner contends that Trial Counsel should have called Sims to testify about Petitioner's Memphis trip. In support, Petitioner points to Sims' declaration in which she states that she spoke with Petitioner on March 1, 2004 about his plan to take the trip to Memphis; that on the evening of March 1, 2004, Petitioner went to the Greyhound bus station; that either during the late evening of March 1, 2004 or on March 2, 2004, Petitioner called Sims and they talked about the fact that he was on the bus trip en route to his destination; and that when Petitioner left on the bus trip, he took one of the phones connected to Sims' account with him and must have used that phone to call her. See Mot. Ex. H Decl. of Chetarah Sims ("Sims Decl.") ¶¶ 2-4, ECF No. CR-2086-9, CV-11-9. Petitioner also points to phone records from Sims' account showing five phone calls during the morning and evening of March 2, 2004, which he alleges confirm the statements in Sims' declaration, namely that on March 2, 2004, she spoke to Petitioner whilst he was on his bus trip. See Mot. Ex. I. However, Sims was an unreliable witness, as evidenced by her inconsistent and vague statements on a variety of related matters. See

Lasting Interrog. Resp. No. 13 ███████████ ██████████████████████ ███████████████████████ ████████████████████ ███████████████████ ██████████████████.[19]  Further, at most the phone records only show that a number that Petitioner may have been using on March 2, 2004 had connected several times to Sims' number in Los Angeles and that the calls lasted anywhere from three to seven minutes each.  Importantly, however, the records do not contain information supporting that Petitioner actually took the trip to Memphis, as none of the records indicate where *Petitioner* was located when he made or received calls.

---

[19] See e.g. Jacks Interrog. Resp. No. 13 ██████ ████████████████████████████ ██████████████████████████ ██████████████████████████ ████████████████████████████ █████████████████████████ ██████████████████████████ ███████████████████████████ █████████████████████████ █████████████████████████ ██████████████████████████ ██████████████████████████ █████████████████████████ ██████████████████████████ █████████████████████████ ████.

Given the lack of strong evidence supporting
Petitioner's trip to Memphis, the weak impeachment
value it would have if Dunagan simply stated that
he got the date wrong, and the grave risk that the
jury would interpret the trip as Petitioner
attempting to flee after committing the robbery,
Trial Counsel acted reasonably in choosing to focus
their impeachment efforts elsewhere.  Specifically,
Trial Counsel gathered and presented impeachment
evidence to attack Dunagan's claim that Petitioner
had shot himself in the foot.  See Opp'n at 77:7-
78:2 (citing ECF No. 1708, 3/2/10 RT 152-70; ECF
No. CR-1709, 3/3/10 RT 5-16).  Trial Counsel had
Petitioner physically examined and x-rays taken of
his feet, and had two experts testify at trial
expressing doubt that Petitioner suffered any type
of gunshot wound.  Id.  Trial Counsel also
undertook great efforts to impeach Dunagan's
credibility as a witness based on his background.
See Opp'n at 78:3-79:11.  In addition to the
discovery the Government produced on Dunagan
consisting of his extensive criminal background,
his prior cooperation with the Government, his lies
to law enforcement in court proceedings, and his
phone records and calls from custody, see Opp'n at
78 n. 62, Trial Counsel conducted a thorough
investigation to gather impeachment evidence:



Jacks Interrog. Resp. No. 16; <u>see</u> <u>also</u> Lasting
Interrog. Resp. No. 16 ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████.   At trial, Trial Counsel elicited
much of this damaging evidence against Dunagan
during their thorough cross-examination of him.
Trial Counsel also questioned several law
enforcement witnesses about inconsistent statements
made by Dunagan, and presented their own witnesses
and evidence to impeach aspects of Dunagan's
testimony.  <u>See</u> Opp'n Ex. D, at *41 n.33.

   Thus, even without introducing Petitioner's

trip, Trial Counsel were effective in putting forth substantial impeachment evidence. Trial Counsel's decision to rely on this impeachment evidence, which came without any risk to Petitioner, instead of hedging their bets by introducing weak evidence of a trip which could be perceived as an attempt by Petitioner to flee on the night of the crime, was reasonable.[20] See <u>Hensley v. Crist</u>, 67 F.3d 181, 185 (9th Cir. 1995) (citation omitted) ("Tactical decisions that are not objectively unreasonable do not constitute ineffective assistance of counsel."). Thus, the Court **DENIES** Petitioner's claim of ineffective assistance of counsel with respect to Trial Counsel's handling of the Dunagan evidence.

**D.   Request For Evidentiary Hearing**

Pursuant to 28 U.S.C. §2255, a hearing must be granted "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). In making such determination, "[s]ection

_____

[20] Petitioner doubts that the Court would have instructed the jury that the trip could be evidence of flight and consciousness of guilt. <u>See</u> Reply at 73:6-74:20. Even assuming that were true, the jury would still draw their own conclusions about the suspicious timing of the trip and the Government would have been free to connect these dots for the jury in their closing argument. In other words, just because the jury may not have received an instruction that the trip could be evidence of flight, does not mean that the evidence would not have been perceived that way.

2255 requires only that the district court give a claim 'careful consideration and plenary processing, including full opportunity for presentation of the relevant facts.'" <u>Shah v. United States</u>, 878 F.2d 1156, 1159 (9th Cir. 1989) (citations omitted). The "choice of method [is entrusted] to the court's discretion." <u>Id.</u>

Petitioner moves for an evidentiary hearing as to the claims relating to counsel's ineffective representation regarding the Burgess evidence. <u>See</u> Reply at 78:13-14; Mot. at 66:25-26. However, other than making the conclusory statement that "Petitioner has made factual allegations that entitle him to relief," Petitioner fails to provide any reason why an evidentiary hearing is warranted. The Court has already permitted both parties to file extremely lengthy briefs in order to ensure that both sides are fully heard. <u>See</u> Mot. (67 pages excluding exhibits); Opp'n (87 pages excluding exhibits); Reply (79 pages excluding exhibits). These briefs, in addition to the exhibits attached thereto, adequately flesh out each side's positions regarding the Burgess evidence. The arguments made have been adequately addressed by the parties' briefs, exhibits, and the existing voluminous record in this case, with which the Court is very familiar. The Court has thoughtfully considered each argument presented by

Petitioner, and has concluded that even assuming the truth of Petitioner's allegations, he would not be entitled to relief because he has failed to establish a reasonable probability that without the Burgess evidence, the jury would have had a reasonable doubt about Petitioner's guilt. <u>See</u> <u>Baumann v. United States</u>, 692 F.2d 565, 571 (9th Cir. 1982) ("[T]he petitioner . . . must only make specific factual allegations which, if true, would entitle him to relief."). Because the Motion, files and records in this case conclusively establish that Petitioner is not entitled to relief, the Court **DENIES** Petitioner's request for an evidentiary hearing.

**E.  Certificate of Appealability**

Under 28 U.S.C. § 2253(c), a federal prisoner must seek and obtain a certificate of appealability ("COA") to appeal the district court's denial of relief under § 2255.  28 U.S.C. § 2253 (c)(1).  A district judge may also issue a COA.  <u>See</u> Fed. R. App. P. 22 (b); <u>United States v. Asrar</u>, 116 F.3d 1268, 1269-70 (9th Cir. 1997) ("[D]istrict courts possess the authority to issue certificates of appealability in § 2255.").  A "certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (c)(2). The petitioner must show that reasonable jurists

could debate whether the petition should have been resolved differently or that the issues presented are "adequate to deserve encouragement to proceed further." <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000).

Petitioner fails to meet this burden. Because Hobbs Act robbery is a crime of violence under the Force Clause, § 924(c)(3)(A), reasonable jurists could not debate whether Petitioner's § 2255 Motion could be decided differently with respect to his § 924(c) sentence. Moreover, based on all of the reasons already stated in the Court's analysis rejecting Petitioner's ineffective assistance of counsel claims, reasonable jurists could not debate whether Petitioner's ineffective assistance of counsel claims could be decided differently. In short, Petitioner has failed to make a "substantial showing of the denial of a constitutional right." As such, the Court **DENIES** Petitioner's request for the Court to issue Petitioner a Certificate of Appealability.

///
///
///
///
///
///
///

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES** Petitioner's § 2255 Motion. The Court further **DENIES** Petitioner's request for an evidentiary hearing, and **DENIES** Petitioner's request for a certificate of appealability.

DATED: April 23, 2019

/s/ RONALD S.W. LEW

**HONORABLE RONALD S.W. LEW**
Senior U.S. District Judge